UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRED McCULLOUGH, | No. C 05-2207 MHP (pr) |
| Petitioner, | **ORDER GRANTING HABEAS PETITION** |
| v. | |
| ANTHONY P. KANE, warden, | |
| Respondent. | |

## INTRODUCTION

Fred McCullough, a prisoner at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254 to challenge the California Governor's 2004 decision that he was not suitable for parole. After 21 years of incarceration on his 15-to-life sentence during which he has exhibited very favorable prison behavior for almost two decades, McCullough's crime and pre-offense criminality do not provide sufficient evidence to support the Governor's decision that he is currently unsuitable for parole. The petition will be granted.

## BACKGROUND

Fred McCullough was convicted in 1983 in Los Angeles County Superior Court of second degree murder and was sentenced to a term of 15 years to life in prison. His habeas petition does not concern that conviction directly, but instead focuses on the August 12, 2004 decision by Governor Arnold Schwarzenegger to reverse a March 17, 2004 decision by the Board of Prison Terms (now known as the Board of Parole Hearings

("BPH")) finding him suitable for parole.  This was McCullough's second reversal: McCullough also had been found suitable by the BPH in 2002, but that was reversed by Governor Davis.

The specifics regarding the crime and the circumstances regarding parole suitability are described in the Discussion section later in this order and are only mentioned here in brief.  In 1982, McCullough used a brick to kill a man by hitting him 2-3 times in the head to facilitate the robbery of that man to obtain money to buy drugs.  Before McCullough committed the murder at age 20, he had several juvenile adjudications for crimes and had a significant alcohol and substance abuse problem.  As will be shown below, McCullough had an unfavorable start to his imprisonment, but turned his life around in 1985 and has exhibited exemplary behavior since that time.

McCullough sought relief in the California courts.[1]  The California Court of Appeal denied McCullough's petition for writ of habeas corpus in a one-sentence order citing In re Rosenkrantz, 29 Cal. 4th 616, 667 (Cal. 2002).  Resp. Exh. E.  The California Supreme Court summarily denied his petition for review.

McCullough then filed his federal petition for writ of habeas corpus, asserting that his right to due process had been violated.  After an unsuccessful motion to dismiss, respondent filed an answer.  McCullough filed a traverse.  The matter is now ready for a decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged action occurred at the Correctional Training Facility in Soledad.  Soledad is in Monterey County and within this judicial district.  28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

2

highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

The application of § 2254(d) in this case is affected by the fact that there is no reasoned explanation by a state court for the rejection of Willis' habeas petitions on the merits. The state courts gave no reasoned explanation of the denial of the petitions. Where, as here, the state court gives no reasoned explanation of its decision, an "independent review of the record" is the only means of deciding whether the state court's decision was objectively reasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

## DISCUSSION

A.   Biased Decision-Maker Claim

McCullough asserted in his petition that Governor Schwarzenegger has an anti-parole policy in violation of due process. See Petition, p. 9. The claim fails for a lack of evidentiary support, as McCullough has presented no evidence to support his allegations. Indeed, his assertion that Governor Schwarzenegger grants parole in a third of cases that

3

come before him undermines the assertion that he is systematically biased against parole and has an anti-parole policy. The court now turns to McCullough's claim that the decision reached by the Governor violated due process.

B.     Sufficiency Of Evidence Claim

    1.     Due Process Requires That Some Evidence Support A Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). California law adds a layer of review by giving the governor the power to review the parole board's decision and to affirm, modify or reverse the decision but only on the basis of the same factors the parole authority is required to consider. See Cal. Penal Code § 3041.2; Cal. Const. art. V, § 8(b). The California Supreme Court has determined, as a matter of state law, that the governor's decision must also satisfy the "some evidence" standard. See In re Rosenkrantz, 29 Cal. 4th 616, 676-77 (Cal. 2002), cert. denied, 538 U.S. 980 (2003). Because the governor's review is an extension of the parole consideration process and the parole decision does not become final until such review has occurred (or the time for it has passed), the governor's decision must be supported by some evidence.

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board or the governor. Id. at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings

4

1  of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting
2  Superintendent v. Hill, 472 U.S. at 457).  The some evidence standard of Superintendent v.
3  Hill is clearly established law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d
4  at 1129.

5       Having determined that there is a due process right, and that some evidence is the
6  evidentiary standard for judicial review, the next step is to look to state law because that sets
7  the criteria to which the some evidence standard applies.  One must look to state law to
8  answer the question, "'some evidence' of what?"

9       2.     State Law Standards For Parole For Murderers In California

10       California uses indeterminate sentences for most non-capital murderers, with the term
11  being life imprisonment and parole eligibility after a certain minimum number of years.  A
12  first degree murder conviction yields a base term of 25 years to life and a second degree
13  murder conviction yields a base term of 15 years to life imprisonment.  See In re
14  Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal
15  Code § 190.  The upshot of California's parole scheme described below is that a release date
16  normally must be set unless various factors exist, but the "unless" qualifier is substantial.

17       A BPH panel meets with an inmate one year before the prisoner's minimum eligible
18  release date "and shall normally set a parole release date. . . . The release date shall be set in a
19  manner that will provide uniform terms for offenses of similar gravity and magnitude in
20  respect to their threat to the public, and that will comply with the sentencing rules that the
21  Judicial Council may issue and any sentencing information relevant to the setting of parole
22  release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the
23  panel "shall set a release date unless it determines that the gravity of the current convicted
24  offense or offenses, or the timing and gravity of current or past convicted offense or offenses,
25  is such that consideration of the public safety requires a more lengthy period of incarceration
26  for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal.
27  Penal Code § 3041(b).
28

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[2] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b). As noted earlier, the governor's review must be done on the basis of the same factors the parole authority is required to consider. See Cal. Penal Code § 3041.2; Cal. Const. art. V, § 8(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires the prisoner first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole"). The California Supreme Court's determination of state law in Dannenberg is binding in this federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

6

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also Rosenkrantz, 29 Cal. 4th at 682-83 ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

### 3. McCullough As A Parole Candidate

The negative facts about McCullough concern the commitment offense and his pre-offense history. They were described by the Governor:

> On the evening of July 12, 1982, Fred McCullough and friends were drinking alcohol and smoking marijuana and PCP. He, along with two others, walked through a neighborhood searching for a house to burglarize, hoping to get money to buy more drugs. They came across John Kukish, who was asleep in his car, and decided to rob him instead. Some sort of brick was grabbed from a nearby flowerbed–and Mr. McCullough used it to strike Mr. Kukish multiple times on the head before taking his wallet and fleeing. Mr. Kukish died a few hours later.
>
> Mr. McCullough was arrested by police nine days after the murder. He told the arresting officers, "I was going to turn myself in, I just wanted to spend one more night with my lady, I'll do my 10 years for the murder then start over." After a court trial, Mr. McCullough was convicted of first-degree murder. His conviction was subsequently reduced to second-degree murder, and he was sentenced to 15 years to life in prison.
>
> At the time of the murder, Mr. McCullough was 19 years old. He had no previous criminal record as an adult–but as a juvenile, his history includes assaultive and violent conduct. At age 16, Mr. McCullough stole a purse from an elderly woman, for which he was sent to juvenile probation camp. Later that same year, after his release from camp, Mr. McCullough and two crime partners ambushed, beat, and robbed a man in a public restroom. He again was sent to juvenile probation camp. Mr. McCullough also admits that, at age 17, he argued with a park employee, left the park, and then returned with a stolen gun and threatened to shoot all the employees in the park. He further admits to being a gang member from age 14 through age 17 and being expelled from high school at age 19 following a physical altercation with a school security guard. It was just months after this last incident when Mr. McCullough bludgeoned to death Mr. Kukish during the course of an intended robbery.

7

Petition, Exh. C, p. 1.

Although McCullough's commitment offense and pre-incarceration behavior were undoubtedly negative, positive information about him started developing shortly after his arrival in the CDC system when he decided to change his life.

McCullough went into custody as a high school dropout, but changed that during his imprisonment. Since his arrival in the CDC system, he obtained a G.E.D. in 1986, an A.A. degree and a B.A. degree in social services in 1991. RT 26. One of the BPH commissioners noted that although many prisoners take college courses, this was one of the first times he had seen a prisoner make it all the way through to actually obtain a B.A. degree. RT 26. McCullough attributed his educational achievements to determination, "believing in myself and believing I could turn things around, and hard work." RT 26.

He also developed vocational skills in prison that would make him employable if released from custody. He had been working as a wood finisher in the Prison Industries Authority, where he was the lead man in the spray booth and had been there since about March 2001. RT 27. He had been "receiving exceptional work reports for quite some time across the board with nothing lower than exceptional," according to a commissioner. RT 27-28. His supervisors stated that McCullough also had trained people, and had a good attitude and work ethic. RT 28. McCullough previously had been assigned to culinary and yard maintenance, where he also received favorable reviews. RT 28. He had received a vocational certificate in forklift operation, and had been trained in "vocational upholstery, auto, and furniture." RT 28.

McCullough went into custody with a significant substance and alcohol abuse problem and worked on it in custody. He had started drinking beer at age 12, used PCP fairly often since age 16, used LSD and marijuana numerous times, and "popped pills." RT 18-20, 43. He was using drugs on the day of the murder and his desire to obtain more drugs prompted the robbery of the victim. He saw the connection between drugs and his criminality. See RT 38. After he went to prison, McCullough joined an Alcoholics Anonymous program. He had been participating in A.A. since 1989 or 1990 and had been in

8

the particular A.A. program at his prison since November or December 2001. RT 29. He was able to demonstrate his familiarity with the A.A. program by discussing a step in that program that was of particular value to him. See RT 30-31. He had been sober and drug-free for 18 years, since 1986. RT 31, 43. Although he used marijuana when he first got to prison, he stopped in about 1986 when he started college: "It got to a point where once I got into college, I decided that I would take this serious. It was a point I was going to succeed or I was going to fail. And this is something I wanted to succeed at." RT 32, 43.

He also had done other self-improvement work. He completed a 2-hour "employability program" in 2003. RT 29. Until a housing transfer ended it, he had worked for 1-1/2 years on the juvenile offender deterrent program, which involved inmates speaking to children to steer them away from criminality. See RT 29-30. He had participated in a 14-week workshop concerning the impact of crime on victims and 10 hours of anger management. See Petition, Exh. D, p. 3. He also had participated in "extracurricular activities such as a music program, a holiday donation drive, and a Christmas Festival." Petition, Exh. C, p. 2.

McCullough's disciplinary history shows that he got off to a rough start, but had behaved himself for the last 18 years before the Governor's decision. He received four CDC-115s (three in 1984 for refusal to exit the yard, evading post count, and failure to report; and one in 1985 for threatening staff). RT 33. He also had received 28 CDC-128 counselling memoranda for lesser rules transgressions, although 19 of those occurred in 1984 and 1985 and the last occurred in 1994. RT 33-35. While the number of disciplinary incidents causes some concern, they were for the most part old: he had not received a CDC-115 for 19 years and had not received a CDC-128 for 10 years before the Governor found him unsuitable. The disciplinary pattern fit with his statement that at some point (in about 1985), he decided to "turn things around." RT 26.

The most recent psychological reports were favorable. The 2002 psychological report stated that there was no change from the 2001 report, which in turn stated there was no change from the 1999 report. See RT 40. The last explained report was from psychologist

Terrini on September 17, 1998.  Dr. Terrini said McCullough had an Axis I diagnosis of "polysubstance dependence in institutional remission or at least for the last 18 years" and an Axis II diagnosis of "features of antisocial personality disorder by history, greatly improved."  RT 41.  Dr. Terrini opined that, if released to the community, McCullough's violence potential would be considered somewhat below average relative to the average citizen in the community.  RT 41.

If paroled, McCullough's plan was to reside with his mother in Long Beach.  He also had a standing offer to work for a trucking company.  See RT 21-23.

### 4. The Governor's Decision Did Not Comport With Due Process

Governor Schwarzenegger relied on the commitment offense to find McCullough unsuitable for parole.  The Governor explained:

> Mr. McCullough committed an especially heinous second-degree murder because he preyed upon and bludgeoned a sleeping, unsuspecting, and unthreatening man repeatedly with a brick–ultimately killing him–for the remarkably trivial motive of stealing his money.  And the manner in which Mr. McCullough carried out this crime is vicious.  Not only did he not need to beat the sleeping Mr. Kukish to rob him, Mr. McCullough had a clear opportunity in between each blow to Mr. Kukish's head to stop but did not do so.  This was a cold-blooded, senseless murder that occurred during a planned robbery and was the culmination of Mr. McCullough's escalating criminality and violence.  Significantly, Mr. McCullough was initially convicted of first-degree murder for this crime.  Moreover, he told the Board in 2003 that he and his partners returned to the crime scene about an hour later to "see exactly what [they] had done" and saw emergency personnel trying to assist Mr. Kukish.  Mr. McCullough and his partners then left the scene to buy drugs with the $50 they had stolen from Mr. Kukish, demonstrating an exceptionally callous disregard for this man's suffering and zero remorse at that time.  The nature and gravity of the second-degree murder committed by Mr. McCullough alone is a sufficient basis on which to conclude his release from prison at this time would put society at an unreasonable risk of harm.

Petition, Exh. C, p. 2.

The Governor's consideration of the commitment offense was certainly permissible under the regulation, and his decision that it was "especially heinous" was supported by the undisputed record that McCullough hit the sleeping victim on the head with a brick to kill him. The triviality of the motive also supported a determination that the offense was committed in an especially heinous, atrocious or cruel manner, see 15 Cal. Code Regs. § 2402(c)(1)(E), although killing to facilitate a robbery is, unfortunately, a rather common

1 motive and it is difficult to imagine a motive that wouldn't be a trivial reason for murdering
2 someone.  The Governor also could consider that McCullough had an escalating criminality,
3 including serious assaultive behavior at a young age, as tending to indicate unsuitability for
4 parole.  See 15 Cal. Code Regs. § 2402(c)(2).

5 This case is one of many that turn on the critical question of the BPH's and
6 Governor's use of evidence about the crime that led to the conviction.  Three Ninth Circuit
7 cases provide the guideposts for applying the Superintendent v. Hill some evidence standard
8 on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons
9 v. Carey, 479 F.3d 658 (9th Cir. 2007).  Biggs explained that the value of the criminal
10 offense fades over time as a predictor of parole suitability: "The Parole Board's decision is
11 one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .
12 A continued reliance in the future on an unchanging factor, the circumstance of the offense
13 and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the
14 prison system and could result in a due process violation."  Biggs, 334 F.3d at 916-17.  Biggs
15 upheld the initial denial of a parole release date based solely on the nature of the crime and
16 the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should
17 Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying
18 him a parole date simply because of the nature of Biggs' offense and prior conduct would
19 raise serious questions involving his liberty interest in parole."  Id. at 916.  Next came Sass,
20 which criticized the Biggs statements as improper and beyond the scope of the dispute before
21 the court: "Under AEDPA it is not our function to speculate about how future parole
22 hearings could proceed."  Sass, 461 F.3d at 1129.  Sass determined that the parole board is
23 not precluded from relying on unchanging factors such as the circumstances of the
24 commitment offense or the parole applicant's pre-offense behavior in determining parole
25 suitability.  See id. at 1129 (commitment offenses in combination with prior offenses
26 provided some evidence to support denial of parole at subsequent parole consideration
27 hearing).  Recently, Irons determined that due process was not violated by the use of the
28 commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into

11

1 his 17-to-life sentence.  <u>Irons</u> emphasized that in all three cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in
2 which the court had "held that a parole board's decision to deem a prisoner unsuitable for
3 parole solely on the basis of his commitment offense comports with due process, the decision
4 was made before the inmate had served the minimum number of years required by his
5 sentence."  <u>Irons</u>, 479 F.3d at 665; <u>see e.g.</u>, <u>id.</u> at 660 (inmate in 16th actual year of his 17-to-
6 life sentence).

7       The message of these three cases is that the BPH and Governor can look at immutable
8 events, such as the nature of the conviction offense and pre-conviction criminality, to predict
9 that the prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the
10 weight to be attributed to those immutable events should decrease over time as a predictor of
11 future dangerousness as the years pass and the prisoner demonstrates favorable behavior
12 (<u>Biggs</u> and <u>Irons</u>).  <u>Sass</u> did not dispute the principle that, other things being equal, a criminal
13 act committed 50 years ago is less probative of a prisoner's current dangerousness than one
14 committed 10 years ago.  Not only does the passage of time in prison count for something,
15 exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and
16 <u>Irons</u>.  <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the
17 decision <u>not</u> be arbitrary.

18       The murder and pre-offense criminality in this case are the kinds of immutable events
19 that <u>Biggs</u> cautioned against relying on in perpetuity to deny parole for present
20 dangerousness.  Although the Governor's decision would have been wholly appropriate 10 or
21 20 years ago, today it does not comport with due process – not because the standards have
22 changed but because the passage of time plus evidence of significant positive behavior now
23 reduce the predictive value of the circumstances relied upon by the Governor below the point
24 where they provide enough evidence to support the decision that McCullough would pose an
25 unreasonable risk of danger to society if paroled.  Although the Governor thought the
26 negative factors discussed above outweighed the positive factors for McCullough, even the
27 Governor noted that McCullough had many factors supportive of parole and  "demonstrated
28 considerable progress and increased maturity by remaining discipline-free since 1985."

12

Petition, Exh. C, p. 1.

McCullough's case also presents the interesting procedural feature that he had twice been found suitable by BPH panels. After the seven denials of parole, the BPH voted 2 to 1 in 2000 to deny parole, thus indicating at least 1 panelist thought he was suitable in 2000. RT 61. At his hearing in 2002, the BPH found him suitable. Former Governor Gray Davis reversed the 2002 decision and determined he was not suitable. At his hearing in 2004, the BPH again found him suitable. Governor Schwarzenegger reversed the 2004 decision and determined he was not suitable. The back-and-forth decisions on whether McCullough was suitable for parole – where no new facts were developed and the only change was the passage of time – indicate that the Governor's reversal of the BPH's decision on the same evidence was an arbitrary decision.

McCullough had surpassed his minimum sentence of 15 years by at least 6 calendar years, thereby making his case stronger than that in Irons, Sass or Biggs. He already had been found suitable for parole by two decision-making bodies, also making his case stronger than Irons, Sass, or Biggs. There also was considerable positive information about McCullough in the record as of 2004, when the Governor considered his case. He had not had a CDC-115 disciplinary offense for 19 years. He had taken advantage of numerous rehabilitation and enrichment programs in prison, obtaining a college degree, participating in volunteer work, taking courses in anger management and understanding the impact of crimes on victims, and participating in Alcoholics Anonymous to address his alcohol and substance abuse problem. He had done vocational training and held a job in the Prison Industries Authority wood finishing department, where he had received exceptional work reports from his supervisors. He had favorable psychological evaluations dating from at least 1998.

This is just the sort of case Biggs envisioned, where the commitment offense is repeatedly relied on to deny parole notwithstanding the prisoner's exemplary behavior and evidence of rehabilitation since the commitment offense. In light of the extensive evidence of McCullough's in-prison rehabilitation and exemplary behavior, the reliance on the unchanging facts of the murder and his juvenile criminality to deny him parole 21 years into

13

his 15-to-life sentence violated his right to due process. The some evidence standard provides more protection than against fabricated charges or bureaucratic mistakes -- the some evidence standard also protects against arbitrary decisions. See Superintendent v. Hill, 472 U.S. at 454-55, 457. The Governor's decision was arbitrary and therefore did not comport with the some evidence standard. Having conducted an independent review of the record, see Himes, this court concludes that the state court's unexplained rejection of the due process claim was an objectively unreasonable application of Superintendent v. Hill. McCullough is entitled to relief under the standard of 28 U.S.C. § 2254(d).

Having decided that the petition should be granted, the next question concerns the proper remedy. Once the BPH determined that McCullough was suitable for parole, it calculated his term and assessed a total term of confinement of 258 months, less post-conviction credits of 75 months, for a total period of confinement of 183 months (15.25 years). RT 59-60. The significance of this calculation is that, because the Governor's decision was not supported by some evidence, this court need not send the matter back to the BPH to set a term for McCullough because the BPH has already done so. McCullough is entitled to release and he is past his release date.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is granted. Respondent must release Fred McCullough from custody within **ten days** of the date of this order. Within **twenty days** of the date of this order, respondent must also file a notice with the court confirming the date on which McCullough was released.

IT IS SO ORDERED.

DATED: May 31, 2007

Marilyn Hall Patel
United States District Judge

# NOTES

1.     McCullough attached to his petition an order by the Los Angeles County Superior Court denying his petition for writ of habeas corpus, but the analysis in that order does not match up with the reasons in the 2004 Governor's decision and leads this court to believe that the Los Angeles court's decision concerns a different decision – perhaps the 2002 Governor's decision.  See Petition, Exh. E.   For example, the decision stated that the Governor concluded that McCullough was unsuitable "because he has demonstrated a lack of remorse for the offense and minimizes his responsibility, . . . and has insufficiently participated in self-help programming."  Id. at 2.  Those observations match the discussion in Governor Davis' 2003 decision.  see Petition, Exh. D, p. 2.

2.     The listed circumstances tending to show unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).